PEOPLE ex rel. THIRD AVENUE R. CO. v. STATE BOARD OF TAX COM'RS et al. (CITY OF NEW YORK, Intervener). PEOPLE ex rel. WALLACE et al. v. SAME. PEOPLE ex rel. KINGSBRIDGE RY. CO. v. SAME.

(Supreme Court, Appellate Division, First Department. July 10, 1913.)

1. TAXATION (§ 496*)—CERTIORARI TO REVIEW ASSESSMENT—EQUALIZING ASSESSMENT.

Under Tax Law (Consol. Laws 1909, c. 60) § 290, providing that any person assessed upon any assessment roll claiming to be aggrieved by any assessment therein may present to the Supreme Court a petition duly verified, setting forth that the assessment is illegal, specifying the grounds of the alleged illegality or if unequal, in that the assessment has been made at a higher proportionate valuation than the assessment of the other property on the same roll by the same officers specifying the instances in which such inequality exists, in a certiorari proceeding to review a special franchise assessment, the court should reduce the assessment to the same percentage of valuation as has been followed generally with respect to assessment of other real property on the same roll, but this right to equalization exists only with respect to assessments on the same roll, and the question is not to be determined by the assessments on any other roll.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 890–910; Dec. Dig. § 496.*]

2. TAXATION (§ 496*)—CERTIORARI TO REVIEW ASSESSMENT—EQUALIZING ASSESSMENT.

In a certiorari proceeding to review a special franchise assessment, a recital in a stipulation of the parties that the State Board of Tax Commissioners had "stated" that the ratio of assessed valuations to actual values in a certain county was 89 per cent. had no probative force, since.

even if the board had jurisdiction, what it might have stated would be of no consequence, and there is no statute conferring jurisdiction on the board to determine that question.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 890–910; Dec. Dig. § 496.*]

3. TAXATION (§ 496*)—PRESUMPTIONS IN SUPPORT OF JUDGMENT.

In a certiorari proceeding to review a special franchise assessment for 1910, where an equalization table made by the state board of equalization for the year 1909 showing the ratio of assessed valuations to actual values in a certain county as being 89 per cent., was marked for identification and decision on its admissibility reserved, and it did not appear how the court ruled on its admissibility, it would be assumed on appeal, as against the contention that the court's finding that the ratio was 90 per cent. was against the weight of the evidence, that the court excluded such table or deemed it of little, if any, weight, because it did not show the ratio for 1910.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 890–910; Dec. Dig. § 496.*]

4. TAXATION (§ 496*)—CERTIORARI TO REVIEW ASSESSMENT—EQUALIZING ASSESSMENT.

In a certiorari proceeding, the court determines de novo the value of a special franchise, and from such value modifies the assessment if necessary, and it is on this value, and not upon the value found by the state board of tax commissioners, that the relators' right to equalization depends.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 890–910; Dec. Dig. § 496.*]

5. TAXATION (§ 496*)—CERTIORARI TO REVIEW ASSESSMENTS—FINDINGS.

Where, in certiorari proceedings against the state board of tax commissioners to review a special franchise assessment, a city intervened as defendant, and on the hearing through its counsel refused to concede that the validity of the assessment was to be determined by the application of the net earnings rule, but took the position that the assessments were presumed to be legal and valid, and that the burden of showing error or overvaluation was on the relators, and the court found that the trial was had by all parties upon the theory that the basis for ascertaining the true value of the franchise was the net earnings rule, but also found that the relators tried the proceeding on that theory, but that the board and the city tried them on the theory that the assessments were presumed correct, the first mentioned finding would be construed as merely meaning that the only evidence offered was evidence bearing on the net earnings theory, and not as precluding the city from contending on appeal that it was incumbent upon the relators to prove the invalidity of the assessment.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 890–910; Dec. Dig. § 496.*]

6. TAXATION (§ 376*)—VALUATION OF FRANCHISE—NET EARNINGS RULE.

Where a railroad has been constructed, equipped, and completed and is in operation, and the company is in the full use and enjoyment of all of its franchises, the net earnings rule is presumptively the proper rule by which to determine the value of the special franchise for the purpose of taxation; and hence, where there was no evidence to show mismanagement by reason of which the net earnings were not what they should have been or to show that the net earnings rule should not be applied, that rule was properly applied.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

7. TAXATION (§ 376*)—MODE OF ASSESSMENT—FRANCHISE TAX—"NET EARN-
INGS RULE."

The net earnings rule for assessing a special franchise for taxation
starts with the gross earnings for the year ending with the commence-
ment of the year for which the valuation is made from which is de-
ducted operating expenses and a fair and reasonable return on that por-
tion of the corporation's capital invested in tangible property, the bal-
ance being deemed to give the net earnings attributable to the special
franchise, the value of which is then found by capitalizing such balance
at a rate 1 per cent. higher than that found as a matter of fact to be a
fair and reasonable return on the tangible property.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631;
Dec. Dig. § 376.*]·

8. TAXATION (§ 376*)—MODE OF ASSESSMENT—FRANCHISE TAX—NET EARN-
INGS RULE.

In assessing a special franchise for taxation under the net earnings
rule, what is a fair and reasonable return on the capital invested in tangi-
ble property is a question of fact.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631;
Dec. Dig. § 376.*]

9. TAXATION (§ 376*)—FRANCHISE TAX—LIABILITY—FAILURE TO EXERCISE
FRANCHISE.

A street railroad company controlled by another company by which its
lines are operated, and which, although nominally in existence, fails to
exercise its franchise for its own benefit or to collect rental therefor,
cannot be heard to say that its special franchises are not worth what
the evidence shows their value would be if it operated them or exacted
a rental or other income from the company operating its lines for the
use thereof.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631;
Dec. Dig. § 376.*]

10. TAXATION (§ 496*) — CERTIORARI TO REVIEW ASSESSMENT — BURDEN OF
PROOF.

Where, in a certiorari proceeding to review a special franchise assess-
ment, it appeared that the relator was not exercising its franchise, and
had no income, and that the net earnings rule therefore would not be
applicable, but no evidence was offered to show that the assessment could
not be sustained on any other rule, it was properly allowed to stand as
made.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 890–910; Dec.
Dig. § 496.*]

11. TAXATION (§ 496*)—CERTIORARI TO REVIEW ASSESSMENT—APPEAL—RE-
VIEW.

In two certiorari proceedings tried together to review special franchise
assessments against the T. Company and the K. Company, both companies
appeared by the same counsel. It appeared that the T. Company con-
trolled the K. Company, and operated its lines. There was introduced
in evidence a tabulation of the accounts of the T. Company showing the
passenger fares received from the operation of both companies, and that
a specified amount was received from the operation of the K. Company.
No question was raised with respect to the apportionment of the net
earnings between the two companies, and the court apportioned them
in the proportion that the fares collected on each bore to the total fares
collected. It was stipulated that the T. Company derived the entire pro-
ceeds or income from the operation of the K. Company's lines, and it
was contended that therefore no assessment could be made against the
K. Company. *Held*, that the assessments would not be disturbed, since
the T. Company could not have the benefit of the exclusion of a part of
its net income in determining the value of its special franchise and at

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the same time in behalf of the K. Company object to any assessment against that company.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 890–910; Dec. Dig. § 496.*]

12. TAXATION (§ 496*)—CERTIORARI TO REVIEW ASSESSMENT—APPEAL—REVIEW.

Under such circumstances, the apportionment of the net earnings on the basis of the fares received on account of the operation of each company rather than on a mileage basis would not be disturbed.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 890–910; Dec. Dig. § 496.*]

13. TAXATION (§ 376*)—MODE OF ASSESSMENT—FRANCHISE TAX—NET EARNINGS RULE.

In assessing special franchises for taxation under the net earnings rule, the legal rate of interest was properly adopted as a fair return on the capital invested in tangible property, in the absence of any evidence satisfactorily showing that this would not be a reasonable return thereon.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

14. TAXATION (§ 376*)—MODE OF ASSESSMENT—FRANCHISE TAX—NET EARNINGS RULE.

In assessing special franchises for taxation under the net earnings rule, where the court allowed 6 per cent. as a fair return on the tangible property, it should have capitalized the balance of the net income on the basis of 7 per cent. to determine the intangible element of the special franchise.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

15. TAXATION (§ 376*)—MODE OF ASSESSMENT—FRANCHISE TAX—NET EARNINGS RULE.

In assessing a street railroad company's special franchise for taxation under the net earnings rule, the value of cars owned by it and leased to other companies, and therefore not used in connection with the special franchise, should not be included in the tangible property on which a return is allowed, and the rental should not be included in the gross earnings, although the cars are of such a character as to be used by the lessee only during a portion of the year, and when not in use are stored by the owner.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

16. TAXATION (§ 376*)—MODE OF ASSESSMENT—FRANCHISE TAX—NET EARNINGS RULE.

In assessing a street railroad company's special franchise for taxation under the net earnings rule, the value of its tangible property upon which a return is to be allowed is its present or depreciated value, and not the cost of reproducing it new.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

17. TAXATION (§ 376*)—MODE OF ASSESSMENT—FRANCHISE TAX—NET EARNINGS RULE.

In assessing a street railroad company's special franchise for taxation, development expenses consisting of expenses for legal advice, technical advice, consents of public service commissions, or other public bodies, completing the organization, preliminary surveys, property owners' consents, interest, and taxes during the construction, promoter's profits, and the financial man's charges or broker's commissions for raising the necessary capital or underwriting the securities, are not to be added to the value of the tangible property in determining the amount upon which a

return is to be allowed, since the taxes and interest are presumptively given proper consideration in determining the value of the tangible property, and the other expenses do not add to the value of such property, but, if anything is obtained therefor, are represented by the intangible element of the special franchise.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

18. TAXATION (§ 376*)—MODE OF ASSESSMENT—FRANCHISE TAX—NET EARNINGS RULE.

In assessing a street railroad company's special franchise for taxation under the net earnings rule, the total value of a car barn and a substation, parts of which were rented to other parties, should be added to the value of the tangible property upon which the company is entitled to a return and the rentals less the taxes added to the gross income, since the company in building is not required to limit the size of its building to its requirements at the time, but may properly build for the reasonable future requirements of the company.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

19. TAXATION (§ 376*)—MODE OF ASSESSMENT—FRANCHISE TAX—NET EARNINGS RULE.

In assessing a street railroad company's special franchise for taxation under the net earnings rule, the value of a stable rented for private purposes and not used in connection with the operation of the franchise, and of a parcel of unimproved real estate not used in any manner, should not be included in the tangible property upon which a return should be allowed, and the income therefrom should not be included in the gross income.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

20. TAXATION (§ 496*)—CERTIORARI TO REVIEW ASSESSMENT—APPEAL—DISPOSITION OF CAUSE.

On appeal in a certiorari proceeding to review the assessment of a special franchise under the net earnings rule, where the rentals from property which it was determined should be added to the gross income, and the taxes on such property was not shown separately from the rental from and taxes on property which it was held should be excluded from consideration, the total taxes and total rents would be apportioned according to the value of the respective parcels.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 890–910; Dec. Dig. § 496.*]

21. TAXATION (§ 376*)—MODE OF ASSESSMENT—FRANCHISE TAX—NET EARNINGS RULE.

Under Tax Law (Consol. Laws 1909, c. 60) § 48, providing that if, when the tax assessed on any special franchise is due and payable, it shall appear that the corporation affected has paid to the city in which its tangible property is located for its exclusive use under any agreement therefor or any statute requiring such payment any sum based upon a percentage of gross earnings or any other income or any license fee or sum of money on account of such special franchise which payment was in the nature of a tax, all amounts so paid shall be deducted from any tax based on the special franchise assessment for city purposes in assessing a street railroad company's special franchise under the net earnings rule, car license fees and other payments mentioned in section 48 should be deducted as disbursements from the gross income, although they are also to be deducted from the amount of the tax when ascertained.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

22. TAXATION (§ 376*)—MODE OF ASSESSMENT—FRANCHISE TAX—NET EARN-
INGS RULE.

In assessing a special franchise for taxation under the net earnings
rule, amounts paid during the year during which the gross receipts taken
as the basis of computation were received on account of taxes for prior
years and other obligations incurred in prior years are not to be de-
ducted as operating expenses from the gross receipts.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631;
Dec. Dig. § 376.*]

23. TAXATION (§ 496*) — CERTIORARI TO REVIEW ASSESSMENT — BURDEN OF
PROOF.

In a certiorari proceeding to review a special franchise assessment, the
relator was not entitled under the net earnings rule to have deducted
from the gross receipts a payment of an assessment "for some sort of
improvements," where it was not shown against what property it was
levied, nor anything further with respect to it.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 890–910; Dec.
Dig. § 496.*]

24. TAXATION (§ 376*)—MODE OF ASSESSMENT—FRANCHISE TAX—NET EARN-
INGS RULE.

In assessing a street railroad company's special franchise for taxation
under the net earnings rule for a year during which it was operated by
a receiver appointed by a federal court, the receiver's salary should have
been deducted as an operating expense from the gross income.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631;
Dec. Dig. § 376.*]

25. TAXATION (§ 496*) — CERTIORARI TO REVIEW ASSESSMENT — BURDEN OF
PROOF.

In a certiorari proceeding to review the assessment of a street rail-
road company's special franchise under the net earnings rule, where the
court allowed the relator a return on a working capital of $400,000, the
court properly refused to deduct from the gross receipts an item taken
from the relators' books showing money received for interest and dis-
count where the particular source of income was not otherwise shown,
as it might have been interest earned on the working capital.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 890–910; Dec.
Dig. § 496.*]

26. TAXATION (§ 376*)—MODE OF ASSESSMENT—FRANCHISE TAX—NET EARN-
INGS RULE.

In assessing a street railroad company's special franchise for taxation
under the net earnings rule, there should be deducted from the gross re-
ceipts in addition to a deduction of the ordinary expenses of operation in-
cluding ordinary repairs and ordinary renewals and replacements of
parts of old appliances, machinery, structures, and equipment a further
deduction to cover current and future disbursements for new construc-
tion and new machinery, appliances, and equipment.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631;
Dec. Dig. § 376.*]

27. TAXATION (§ 376*)—MODE OF ASSESSMENT—FRANCHISE TAX—NET EARN-
INGS RULE.

Under the net earnings rule for assessing special franchises for taxa-
tion in determining the probable life of each item or unit of tangible
property suffering depreciation and allowing a deduction for replacements
thereof, obsolescence should be given consideration.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631;
Dec. Dig. § 376.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

28. TAXATION (§ 496*)—CERTIORARI TO REVIEW ASSESSMENT—EVIDENCE.

In a certiorari proceeding to review a street railroad company's special franchise assessment for taxation, evidence *held* to show that of about $200,000 deducted by the court from operating expenses under the net earnings rule as covered by the amount allowed by stipulation for depreciation only about $40,000 represented expenditures for new equipment, etc., and hence only that amount should have been deducted.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 890–910; Dec. Dig. § 496.*]

Appeal from Special Term, New York County.

Three certiorari proceedings by the People, on the relation of the Third Avenue Railroad Company, James N. Wallace, and others and the Kingsbridge Railway Company, respectively, against the State Board of Tax Commissioners, in which the City of New York intervened as defendant. From a final order in the first two proceedings, confirming the assessment of the special franchises of the Third Avenue Railroad Company by the State Board of Tax Commissioners for the year 1910 and dismissing writs of certiorari to review such assessments and an order in the third proceeding confirming the assessment of the special franchise of the Kingsbridge Railway Company for the same year and dismissing a writ of certiorari, the relators respectively appeal. Modified and affirmed.

Argued before INGRAHAM, P. J., and LAUGHLIN, SCOTT, DOWLING, and HOTCHKISS, JJ.

Joseph P. Cotton, Jr., of New York City (George S. Franklin, of New York City, on the brief), for appellants.

William A. McQuaid, of New York City, for respondent State Board of Tax Com'rs.

Curtis A. Peters, of New York City (Addison B. Scoville, of New York City, on the brief), for respondent City of New York.

LAUGHLIN, J. The state board of tax commissioners, which, for brevity, I shall call the state board, assessed the special franchises of the Third Avenue Railroad Company for the year in question at $7,-920,000, and those of the Kingsbridge Railway Company at $759,000. The proceedings were originally instituted in the county of Albany against the state board only; but subsequently the city of New York was permitted to intervene as a respondent, and the place of trial was changed to the county of New York. The three certiorari proceedings were tried together, and are presented for review by a single record. The first proceeding was instituted by the Third Avenue Company to review the assessment against it; the second by Wallace and others, as a committee representing the purchasers of the Third Avenue line on foreclosure, to review the same assessment; and the third by the Kingsbridge Company to review the assessment against it. The learned court at Special Term found that, although the assessments as made represented the full value of the special franchises as found by the state board of tax commissioners, yet, as a matter of fact, the value of the special franchises of the Third Avenue Company determined by the net earnings rule, so called, was $10,868,806.56, and of those

---

of the Kingsbridge Company $1,033,513.30, and that, therefore, the assessments as made only represented about 73 per cent. of the actual value of the special franchises. These appeals present many interesting points and some difficult questions of law which I shall endeavor to state and consider in what appears to be their logical order.

[1-3] First. The learned counsel for the appellants contended at Special Term, and argues here, that they were in any event entitled to have the assessments reduced to 89 per cent. of the value as determined by the state board, in order to equalize them with the other assessments. It has been authoritatively settled that on certiorari the court should reduce special franchise assessments to the same percentage of valuation as has been followed generally with respect to the assessments of other real property on the same roll. People ex rel. H. & M. R. R. Co. v. State Board of Tax Commissioners, 142 App. Div. 220, 126 N. Y. Supp. 1063, reversed on another point 203 N. Y. 119, 96 N. E. 435; Id., 143 App. Div. 26, 127 N. Y. Supp. 918, reversed on another point 203 N. Y. 119, 96 N. E. 435; People ex rel. Jamaica Water Supply Co. v. State Board of Tax Com'rs, 196 N. Y. 39, 89 N. E. 581. A stipulation in writing was made between the Attorney General, who appeared for the state board, and counsel for the relators, which provided, among other things, that the relators were "entitled to at least an equalization allowance of 10% of the assessment and that the state board of tax commissioners has stated that for the purposes of direct taxation the values in the county of New York shall be equalized on the basis of 11%," and it was offered and received in evidence. The stipulation also embraced the gross earnings and operating expenses of the railroads. When it was offered in evidence, counsel for the city said:

"With regard to this stipulation, the city stands mute until it receives the result of the combined examinations of the experts employed by the Attorney General and by myself."

It was received in evidence subject to verification of the figures and to a motion to strike it out if they were found to be inaccurate. The relators offered in evidence an equalization table made by the state board of equalization for the year 1910, which showed that in the county of New York in the year 1909 the ratio of assessed valuations of real and personal property to actual values was 89 per cent. It was received in evidence without objection, but it was subsequently claimed by counsel for the respondents that their attention was not drawn to it, and they objected to it on the ground that it was immaterial and irrelevant, and that it was no part of the duty of the state board of equalization to determine ratios and percentages or to prepare said table. Counsel for the respondents now make the further objection to that table, which they did not specifically take on the hearing, that it merely shows that in the year 1909, which is not the one in question, the ratio was 89 per cent., and that there is no evidence that it was the same in the year 1910. The only right to equalization is with respect to assessments on the same roll (Tax Law, § 290), and therefore that question was to be determined by the ratio of assessments for the year 1910. The court, in effect, accepted the excuse

thus made for not timely objecting and reconsidered the ruling receiving the table in evidence and marked it for identification, reserving decision on its admissibility, and suggested that counsel might argue the question in their briefs to be submitted. The court subsequently found that the ratio of assessed valuation to actual values of real estate, other than special franchises, in the borough of Manhattan for the year 1910 was 90 per cent., but the record does not otherwise indicate how the court ruled on the admissibility of the equalization table. Counsel for the respondents contend that this finding by the court is correct, but counsel for the relators claim that it is against the evidence, and that the court should have found that the ratio was 89 per cent. This question became important on the hearing, and the objection to the equalization table was taken in ample time to enable the relators to make any further proof, if they were able to do so. They rested their case on the stipulation made with the Attorney General, which contains the recital that the state board of tax commissioners had stated that the ratio for 1910 would be 89 per cent. That part of the stipulation, however, could have no probative force, because what the state board of tax commissioners may have "stated" would be of no consequence, even if they had jurisdiction in the premises; but no statute has been cited, and we have found none conferring jurisdiction on that board to determine that question. Therefore, without expressing an opinion as to whether the determination of the state board of equalization with respect to the ratio would be authorized under section 174 of the Tax Law, or as to whether a table prepared by it was competent evidence thereof, we must in the state of the record assume that the court excluded the equalization table, or deemed it of little, if any, weight, inasmuch as it did not show the ratio for the year 1910.

[4] Second. The appellants further contend that, if they are not entitled to a reduction of the assessments as made by the state board by 11 per cent., they are at least entitled to have them reduced 10 per cent. The court decided that they were not entitled to any reduction, for the reason that such right depended on the actual value of their special franchises, and not the value placed upon them by the state board. The learned court was entirely right in the ruling made on this point. On a certiorari proceeding the court determines de novo the value of the special franchises, and from such value decides whether the state board erred, and, if necessary, modifies the assessment (People ex rel. Manhattan R. Co. v. Barker, 152 N. Y. 417, 46 N. E. 875; People ex rel. H. & M. R. R. Co. v. State Board of Tax Com'rs, 143 App. Div. 26, 34, 127 N. Y. Supp. 918; reversed on another point, 203 N. Y. 119, 96 N. E. 435), and it is on the value as thus found, and not upon the value as found by the state board of Tax Commissioners, that the relators are entitled, if at all, to equalization (People ex rel. Manhattan Ry. Co. v. Woodbury, 203 N. Y. 231, 235, 96 N. E. 420; People ex rel. H. & M. R. R. Co. v. State Board of Tax Com'rs, 203 N. Y. 119, 131, 96 N. E. 435).

[5] Third. A question is presented at the outset as to whether the correctness of these assessments is to be determined by the application

of the net earnings rule. The only evidence offered by either side was with respect to the value of the special franchises, tested by the net earnings rule. The appellants contend that the only element of value in these special franchises is in the tangible property in the streets, and that, therefore, its value should be taken as their value for the purpose of taxation; and they further claim that the court did not apply the net earnings rule properly. Counsel for the respondents argue that if the intangible element of the special franchises should be found to be of no value tested by the net earnings rule, then the value of the special franchises must be determined by the adoption of some other rule; and they cite in support of that contention, People ex rel. Jamaica Water Supply Co. v. State Board of Tax Com'rs, 196 N. Y. 39, at page 59, 89 N. E. 581, at page 587. In that case the court said:

"If, as is suggested might occur in some supposed cases, this would result in giving a special franchise no taxable value at all, that would be a conclusive reason for rejecting the net earnings rule in such cases, and would demand the adoption of some other method of valuation."

On this point counsel for the respondents further claim that it is not competent for this court to interfere with the assessments, for the reason that the relators have not sustained the burden, imposed upon them by law, of showing that the assessments cannot be sustained tested by the rule which the state board of tax commissioners might lawfully have followed. See People ex rel. H. & M. R. R. Co. v. State Board of Tax Com'rs, 143 App. Div. 26, 34, 127 N. Y. Supp. 918, and cases there cited. In the original returns the state board made no attempt to state the method by which they arrived at the valuations. They were required to make further returns to the writs procured by the Third Avenue Company and the Kingsbridge Company, in each of which they certified, among other things:

"That from the information set forth in the alleged report and supplemental reports of the relator, filed with the state board, it is impossible to work out any satisfactory or correct basis of valuing special franchises herein under review. The board has availed itself of all tests of value within its reach and every fact and all information which in its judgment has any bearing upon such value and no certain or fixed rule or method has been adopted in making said valuation."

In their further return to the writ in the Third Avenue Company proceeding, for the purpose of showing the complications arising from attempting to apply the various rules and theories in determining the value of the special franchises, they gave at length as an illustration what they deemed would be the result of the application of the net earnings rule, based upon the receiver's report of the value of the property, which, however, they pointed out as not being satisfactory in many respects. Computed in that manner, they certified that the value of the special franchises of the Third Avenue Company would be $7,036,921.50. They also in their further returns gave illustrations as to what would be the assessable value if computed by the so-called "sales value" rule, "easement value" rule, and by a method suggested by the receiver in his testimony before the public service commission shortly before the assessments were made. They then certified

that all of those valuations were regarded as unsatisfactory, and that they considered "all of these conditions and elements," and fixed the valuations in the exercise of their best judgment in the light of the conditions presented. At the opening of the hearing, counsel for the relators stated that he would show that the assessments were excessive, tested by the net earnings rule, and he stated what he deemed to be that rule. The deputy attorney general appeared to acquiesce in the application of the net earnings rule as the proper test, and gave an illustration to the court of the manner in which it is applied in determining the value of a special franchise, and further stated that he and counsel for the relators, with a view to shortening the hearing, had entered into a stipulation with respect to the various items of value essential to the application of that rule, and that, therefore, principally questions of law were to be presented; and he stated that one of those questions was whether there should be deducted from the stipulated amount for operating expenses the money expended by the relators for renewals of plant, in view of the fact that a gross amount had been allowed by the stipulation for depreciation. Counsel for the city then addressed the court, and said, among other things, in effect, that, inasmuch as no part of the taxes when collected goes to the state, the city and not the state was the real party in interest; that the city did not concede that the validity of the assessments was to be determined by the application of the net earnings rule, and that it took the position that the assessments are presumed to be legal and valid, and that the burden was on the relators of showing error or overvaluation; that the city had not joined in the stipulation and reserved the right, if an examination of the books and property of the relators should show that the figures embraced in the stipulation were wrong, to prove the true facts. Counsel for the relators then announced as his understanding with respect to the stipulation, which had not then been offered in evidence, that the figures therein should stand as prima facie evidence, subject to correction; and to that no objection was interposed. The stipulation was subsequently received in evidence, in effect, on that understanding. The appellants also contend that the proceedings were tried upon the theory that the net earnings rule was the proper test; but this is not conceded. Counsel for the appellants relies, on this point, on a finding made by the Special Term, to the effect that the proceedings have been tried "by all the parties thereto upon the theory that the basis for ascertaining the true value" of the special franchises on the second Monday of January, 1910, the day as to which the valuation was required to be made, "would be what is known as the net earnings rule, as defined by the Court of Appeals of this state, in the Jamaica Water Supply Case and in subsequent cases." The court, however, by the next finding, found that the relators tried the proceedings on the net earnings theory, but that neither the state board nor the city tried them on that theory, but upon the theory that the assessments were presumed to be correct. The learned counsel for the appellants argues, in effect, that his clients are entitled to the benefit of the more favorable of these conflicting findings, and that the record sustains the first finding, but not the other. I am of opinion that the

first of these findings should be construed as meaning that the only evidence offered on the hearing as a basis for determining the assessable values was evidence bearing upon the net earnings theory. That will harmonize the findings and render them consistent. It is unreasonable to infer, in view of the record as already shown, that the court attempted to preclude the city from contending on the appeal, as it clearly contended on the hearing, at the outset, at least, that the question was not to be determined by the net earnings rule, and that it was incumbent upon the relators to make all necessary proof to show invalidity. It may be, in view of the observations of the Court of Appeals in the Jamaica Case, supra, herein quoted, that if, tested by the net earnings rule, the special franchises would be found to have no value, it would be incumbent upon the relators to go further and show that they would not be of the value assessed, tested by any other rule which the state board might have applied; but, as we view the evidence, it shows that the special franchises in question had a substantial value.

[6] Where, as here, the railroads had been constructed and equipped and completed and in operation, and the relators have been in the full use and enjoyment of all of their franchises for a considerable period of time, I am of opinion that the net earnings rule is presumptively the proper rule by which to determine the value of their special franchises for the purpose of taxation. See People ex rel. Bklyn. Hts. R. R. Co. v. St. Board, 146 App. Div. 372, 131 N. Y. Supp. 49, affirmed 204 N. Y. 648, 97 N. E. 1113; Jamaica Water Supply Co. v. State Board, supra. Therefore, although we are not disposed to hold that the city is estopped by the proceedings upon the hearing from claiming that the valuation should be determined by the application of some other rule, the result is the same, for the reason that the city failed to offer any evidence tending to show mismanagement of the corporations by reason of which the net earnings were not what they should have been, or otherwise tending to show that the net earnings rule should not be applied.

[7, 8] The net earnings rule, as declared by the Court of Appeals in the Jamaica Case, starts with the gross earnings for the year ending with the commencement of the year for which the valuation is made, and from this sum is deducted (1) the operating expenses, and (2) "a fair and reasonable return on that portion of the capital of the corporation which is invested in tangible property," and the balance thus found is deemed to give the net earnings attributable to the special franchises, the value of which is then found by capitalizing such balance "at a fair rate." It has been authoritatively decided by the Court of Appeals that the rate of interest, which will be a fair return on the capital invested in the tangible property, is a question of fact, and that in capitalizing the final balance, which represents the net earnings of the special franchises, for the purpose of ascertaining the value of the special franchises, such balance shall be capitalized at a rate 1 per cent. higher than the rate allowed as a return on the tangible property. People ex rel. Manhattan Ry. Co. v. Woodbury, supra, opinion of Haight, J., concurred in by majority.

[9-12] Fourth. The Third Avenue Company operated the Kingsbridge Road, and the court found that a separate account was kept of the income, but not of the expenses of operation. The accounts of the company for the year ending December 31, 1909, were used as a basis for applying the net earnings rule in determining the taxable values of the special franchises on the second Monday of January, 1910. The court found the net income of both companies to be $498,-661.05, and apportioned that amount between them for the purpose of ascertaining the value of the special franchises of each, according to the proportion the fares collected on each bore to the total fares collected, and found on that basis that 93.444 per cent. of the net income represented the net income attributable to the special franchises of the Third Avenue Company and 6.556 per cent. that of the Kingsbridge Company. The lineal track mileage of the Kingsbridge Company was 19.01 per cent. of the total mileage of both companies. The same attorney and counsel appeared for both companies, and it does not appear that any question was raised upon the hearing with respect to the apportionment of the net earnings between them. It is manifest that taxes should be paid upon the total value of the special franchises of the two companies, and the court should not permit either company to escape its just burden of taxation on technical grounds. The stipulation to which reference has been made contains a statement to the effect that the Third Avenue Company not only operates the Kingsbridge Company, but derives "the entire proceeds or income from such operation." It appears to be contended that the effect of this stipulation is that the Kingsbridge Company received no consideration for such use of its franchises by the Third Avenue Company, and it was stated by counsel for the relators in opening the case on the hearing, speaking of the Kingsbridge Company, "It is a .company which is owned entirely by the Third Avenue Railroad Company." It appears that other companies were spoken of on the hearing as having been controlled by the Third Avenue Company or as subsidiary to it. It must be, therefore, that the Third Avenue Company has purchased all of the stock of the Kingsbridge Company, and it would seem that both of these assessments might well have been imposed upon the Third Avenue Company, for in that view it would own all the special franchises assessed (see section 32, Tax Law, being at the time in question chapter 60, Cons. Laws); and it is scarcely in a position to be heard to object to the assessments against it being separated, and by virtue of section 894 of the Greater New York Charter (Laws 1901, c. 466) the assessment would not be void on account of being made on the wrong party. If it was necessary, however, to divide the assessments, as has been done, then if the Kingsbridge Company, although nominally in existence, has failed to exercise its franchises for its own benefit or to collect rental therefor, it should not be heard to say that its special franchises are not worth what the evidence shows would be their value had it operated them or exacted the rental or other income from the Third Avenue Company for the use thereof. Counsel have not favored us with their views as to whether the law requires that the assessment be made in the name of the Kingsbridge Company, notwithstanding the fact

that its stock is all owned by the Third Avenue Company, and therefore no decided opinion is expressed upon that point, but it may be further observed that if that be so, and if the Kingsbridge Company has failed to operate its line or to exact rent therefor, so that it has no income at all, then the net earnings rule would not, strictly speaking, be applicable; and, since the appellants offered no evidence to show that the assessment could not be sustained on any other rule, it would have to be allowed to stand as made. An accountant employed by the respondents made a tabulation of the accounts kept by the Third Avenue Company, which was received in evidence. It shows the gross passenger fares received from the operation of both companies, and that a specified amount thereof was received from the operation of the Kingsbridge Company. When this tabulation was received in evidence, it was not questioned but that it truly represented what the books of the Third Avenue Company showed. The court evidently took these figures as a basis for apportioning the net income between the two companies. In the circumstances the Third Avenue Company should not be permitted to have the benefit of the exclusion of this part of the net income from the net income on which the value of its special franchises is determined, and at the same time, standing in the shoes of the Kingsbridge Company, be permitted to object to any assessment whatsoever being made against that company on account of the intangible element of its special franchises.

. Counsel for appellants also argues that, if the Kingsbridge Company's special franchises are to be valued on the theory that it had net earnings, then the net earnings of the two companies should have been apportioned on a mileage basis, which would make the assessment against the Third Avenue Company much less. On that theory part of the valuation would escape taxation, as it is now too late to increase the assessment against the Kingsbridge Company. I am of opinion, therefore, that the objections are without merit, and that, since the Third Avenue Company kept its books in such a manner as to show the percentage of fares received on account of the operation of the Kingsbridge Company, the apportionment made of the net earnings between the two companies on that basis did not in the circumstances aggrieve either of them.

[13] Fifth. There is no conflict in the evidence with respect to the value of the tangible property of the respective companies in the streets, which is assessed by the state board as part of the special franchises. The value of the tangible property of the Third Avenue Company in the streets was found to be $3,102,659.40, and of the Kingsbridge Company, $488,643. In applying the net earnings rule, the court found that the value of the intangible element of the special franchises of the Third Avenue Company was $7,766,147.16, and that that of the Kingsbridge Company was $544,870.30, and by adding these respective amounts to the value of the tangible property of the respective companies in the streets the total value of the special franchises of the respective companies was found to be as already stated.

The court allowed a return of 6 per cent. on the value of the tangible property of the companies, both in the streets and outside the streets.

The relators contend, on the testimony of certain experts, who gave their opinions with respect to what would be a proper return on such tangible property, that the court should have allowed a return of 8 per cent. I am of opinion that the court properly determined this question. Six per cent. is the legal rate of interest in this state; and, although that is not controlling, the evidence of the experts does not satisfactorily show that a return at the legal rate of interest would not be a reasonable return on such property. On like evidence the court in People ex rel. Manhattan Ry. Co. v. State Board, 143 App. Div. 905, 127 N. Y. Supp. 1138, affirmed 203 N. Y. 231, 96 N. E. 420, affirmed the allowance of a return of only 6 per cent., and that rate has been applied in numerous other cases. People ex rel. Jamaica Water Co. v. State Board, supra; People ex rel. Third Ave. Co. v. State Board, 136 App. Div. 155, 120 N. Y. Supp. 528.

[14] Sixth. The court capitalized the net income representing the intangible element of the special franchises at 6 per cent. The relators contend that this was error, and that, if the action of the court in allowing only 6 per cent. as a return on the tangible property is sustained, then they were entitled to have such income capitalized on the basis of 7 per cent. This contention on the part of the relators is well founded, and the opinion of Judge Haight on that question in People ex rel. Manhattan Ry. Co. v. Woodbury, supra, which on that point became the opinion of the court, renders further discussion unnecessary.

[15] Seventh. The Third Avenue Company owned 335 cars, valued at $1,436,939.52, which it did not use in the operation of its special franchises, but which it leased to three other companies, and for which it received a rental during the year ending December 31, 1909, of $150,-602; and 135 cars, valued at $501,763, which it did not use, but which it leased to two other companies without charging any rental therefor. In estimating the tangible property upon which a return was allowed, the value of the cars which were leased and upon which a rental was received was included, but not the value of the cars for which no rental was received; and the rental received for the use of cars was included in computing the gross earnings. The appellants contend that the court erred in excluding from the value of the tangible property the value of the cars from which no income was derived, and in including in the gross earnings the rental received from cars leased. They want a return on the value of the cars, but do not want the rent credited to gross receipts. This argument is made upon the theory that those cars were owned by the relators or one of them, and that, therefore, they formed part of the tangible property; but that, inasmuch as they were not used in operating the special franchises, the rental received therefor from other companies should not have been included in the gross earnings. This point requires a construction of the net earnings rule, as applied to these facts, for I have stated the substance of the material evidence. It merely appears that the company owned, but evidently had no present use for, the cars. Neither the circumstances under which they were purchased nor the future necessities of the company were shown. I am of opinion that the Court of Appeals

did not intend to allow a deduction from the gross earnings for a return on tangible property not used in connection with the special franchises, the value of which is being determined. The reasonable construction of the rule is that an allowance from the gross earnings should first be made for a fair return on the tangible property necessarily used in operating the special franchises. It would seem, therefore, that all of these cars should have been excluded in ascertaining the value of the tangible property; and it necessarily follows that the rental derived from the cars should also be excluded from the gross earnings.

A further point somewhat similar is made. It appears that 205 of the 335 cars upon which a rental was received consisted of two classes of cars, known as summer and winter cars. In the summer the summer cars were used by the lessee, and in the winter it used the others. Those not in use were stored by the owner. An argument based upon the fact that these cars were stored by the owner part of the time is made to the effect that in any event the relators are entitled to have one-half the value of these cars, viz., $400,805.01, retained in the value of the tangible property upon which they are entitled to a return. It is undisputed that none of these cars were in any manner used in the operation of the special franchises of the relators. For the reasons already assigned, therefore, their value cannot be retained in the value of the tangible property. It is claimed that the subsidiary companies have been allowed for the rent paid for the use of the cars, and that, if the rents received by the relators are not added to gross receipts, the state may be defrauded. The state and municipality can protect themselves by contesting any unreasonable or exorbitant rental claimed as a disbursement by lessees. These views require a deduction from the net income of the two companies before division for capitalization of $64,385.63.

[16] Eighth. The court found the value of the tangible property of the relators in the streets in its condition on the tax day to be $3,591,302.40, and that it would have cost $5,707,780 to reproduce it new at that time. We are not asked to review these findings of fact; but the appellants contend that they were entitled to have included in the value of the tangible property upon which a return is to be allowed, the reproduction value of the tangible property in the streets, as distinguished from the depreciated or present value thereof, upon which the order of the court was predicated. We are of opinion that the court adopted the proper rule established by the authorities and recently declared by this court. People ex rel. Kings County Lighting Co. v. Willcox and Others, 141 N. Y. Supp. 677, March, 1913; Jamaica Waterworks v. State Board, supra; Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034; City of Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371; San Diego Land Co. v. National City, 174 U. S. 739, at page 757, 19 Sup. Ct. 804, 43 L. Ed. 1154; People ex rel. Brooklyn Heights R. R. Co. v. State Board, 69 Misc. Rep. 646, 127 N. Y. Supp. 825, affirmed 146 App. Div. 372, 131 N. Y. Supp. 49; People ex rel. Man. R'd v. State Board, 143 App. Div. 905, 127 N. Y. Supp. 1138, af-

firmed 203 N. Y. 231, 96 N. E. 420; People ex rel. Queens County Water Co. v. Woodbury, 67 Misc. Rep. 490, 123 N. Y. Supp. 599; Id., 143 App. Div. 618, 128 N. Y. Supp. 522, affirmed 202 N. Y. 619, 96 N. E. 1127; People ex rel. Jamaica Waterworks v. State Board, supra.

[17] Ninth. The relators also claim that the court erred in excluding from the value of the tangible property an item for "development expenses" of $3,094,752.44. This claim is based upon the testimony of a witness, called by the relators, who described what he meant by development expenses, as follows:

"Development expenses are usually taken to include the expenses that must be made for legal advice, technical advice, and obtaining consents of public service commissions, or, rather, other public bodies, and completing your organization, preliminary surveys, and all that sort of thing that is preliminary to the beginning of construction work itself of the physical plant. Then there are also such items as the property owners' consents, the right to build your tracks in the streets, and which must be obtained from property owners. Then there is the item of interest during construction; that is, the physical construction of the property must be paid for as it is erected, or installed, and interest is accumulating on that outlay, which in property of this kind will reach a considerable sum of money before the property is ready to begin operation and produce an income. In the same way taxes accrue from the moment that the real estate is first purchased, usually some time in advance of the beginning of construction. Then, in addition, there is the profit that the promoter of the enterprise will look for, which has been recognized and allowed for by public service commissions and courts, as well as the financial man's charges or broker's commissions, as it is sometimes called, generally charged for the raising of the necessary capital or underwriting the securities. All of those may be grouped as development expenses."

He estimated the amount of what he termed development expenses at 20.05 per cent. of the reproduction cost of the property. He took the reproduction cost from other evidence as a basis, and then figured thereon 6 per cent. for interest on the investment, 5 per cent. for promoter's profit, and 2½ per cent. for broker's commissions, and these together with other items, not figured on a percentage basis, brought the total amount to the estimated percentage. I am of opinion that no error was committed in not adding an item for such development expenses in determining the value of the tangible property upon which a return was to be allowed. The elements which go to make up the so-called development expenses, with the exception of taxes and interest during construction which are presumptively given proper consideration in determining the value of the tangible property as such, do not add to the value of the tangible property. We start with the full and true value of the tangible property, and we are asked to add to such valuation an item that has no bearing on the value of the tangible property. For the so-called development expenses no tangible property is acquired. Those expenses are incurred in developing the franchises to render them of value. In so far as anything is obtained for such items of disbursements, it is represented by the intangible element of the special franchises, and, if so, it is manifest that it could not properly be considered. Development expenses are taken into consideration in determining the value of railroad property as a whole for the purpose of capitalization (People ex rel. Third Ave. Rd. Co. v. Public Service Com'rs, 145 App. Div. 318, 130 N. Y. Supp. 97, affirmed 203

N. Y. 299, 96 N. E. 1011), but such valuation embraces both tangible and intangible property.

[18-20] Tenth. One of the relators owned premises on Ninth and Tenth avenues between 216th and 218th streets, on which was erected a car barn. It did not require the use of the entire building during the year 1909, and it leased part of the upper floor to the Metropolitan Street Railway Company. The court found the value of this real estate to be $325,000, and deducted one-half of that sum from the tangible property on the theory that the company was only using, in connection with its franchise, about one-half of the premises. The relators claim that they should have received a return on the entire value of this property upon the ground that it was held and necessarily required for the purposes of the corporation in connection with the franchises in question, although its immediate necessities at the time did not require the use of the entire building. I am of opinion that this contention is well founded, and that the court erred in finding that the part of the building thus rented was not used in connection with these franchises. The company was not required, in building, to limit the size of its building to its requirements at the time, but had authority, and it was its duty to its stockholders, in the interest of economy, to build for the reasonable future requirements of the company. With regard to the purchase of equipment and rolling stock, it is quite different for presumptively there is no necessity for making such purchases until about the time their use is required. One of the relators owned another parcel of real estate situated on Amsterdam avenue, between 185th and 186th streets, on which a stable had been erected. During the year in question, this stable, which was of the value of $65,000, had been rented for private business purposes, and was in no manner used in connection with the operation of the special franchises. There is evidence of no practical probative force for it does not appear that the witness was qualified to speak on the subject, tending to show that the company held it for its future needs, and on that theory it claims that the value of the property should have been included in the value of the tangible property upon which it is entitled to a return. I am of opinion that the court properly excluded this property upon the ground that no part of it was used in connection with, or was necessary for, the operation or enjoyment of the special franchises. One of the companies also owned premises on the Bowery, on which a substation had been erected, and which was of the value of $405,000. It occupied and used part of this building, and rented $^{70}/_{405}$ thereof for commercial purposes. The court excluded from the valuation of the tangible property the proportionate part of the premises which was rented. This falls within the ruling with respect to the car barn, and the company was entitled to a return on the entire value; but the rental should have been added to the gross income. Another parcel of unimproved real estate of the value of $1,200 was owned by one of the relators. It was excluded from the tangible property, and properly so, I think, for it was not used in any manner, and was merely held for possible future requirements. I recognize that there is room for a difference of opinion with respect to some of these

items, and there is much force in the argument that the company should be allowed a return on property and equipment, purchased and held for future use; but, unless the rule which I have indicated is applied, railway companies may by such purchases avoid the payment of their just proportion of the taxes, and it is far better, I think, to establish a definite rule, even though it be somewhat arbitrary, than to lay down one which would involve an inquiry concerning the motive with which property was purchased or is held for future use, or a review of the judgment of the officers in so doing. The rentals on these premises were not separately shown, but the total rental was $10,418.-15. The same is true with respect to the taxes, and the total was $5,-012.29 on that part of the property rented. According to these views, the value of the tangible property should have been increased by $232,-500, and the gross income should have been increased by the amount of rent received from part of the car barn and part of the substation, less the taxes paid on account of that part of those premises represented by such rentals. Since, however, neither rentals nor taxes were shown separately, this cannot be accurately determined, but it may be determined approximately, I think, by apportioning, according to the value of the respective parcels, the total taxes and total rents between the premises rented, the value of which we are adding to the value of the tangible property, and those premises which we hold were properly excluded in determining the value of the tangible property. On account of this increase in the value of the tangible property, there should be deducted from the gross earnings 6 per cent. on such increase or $13,950 as a reasonable return thereon, and there should be added $4,204.42 on account of increase in gross income. This results in a deduction from the net income, as found, of $9,745.58.

[21] Eleventh. The relators, pursuant to the provisions of section 48 of the Tax Law, paid to the city during the year 1909 $5,382.12 for that year, and for car license fees, pursuant to the provisions of their respective grants, $8,560 for that year; and they claim that those amounts should have been deducted from the gross income before capitalizing the net income representing the value of the intangible element of the special franchises; but the court ruled otherwise. I am of opinion that they were entitled to these deductions. It is the net income of the companies from the operation of the franchises that is to be capitalized. These disbursements were fixed and certain, and the payments were unavoidable. They should be regarded as any other disbursement incurred in operating the franchises. By virtue of the provisions of the same section, these items are deducted from the amount of the special franchise tax, and therefore it is contended by the learned counsel for the respondents that, if those are amounts deducted from the gross income, there will be a double allowance for the same expenditure. I am of opinion that this argument is not sound. The practical effect of failing to deduct these items from the gross income is to capitalize the amount of those disbursements in ascertaining the value of the special franchises upon which the tax is to be levied. The provisions of said section 48 of the Tax Law, so far as material, are as follows:

"If, when the tax assessed on any special franchise is due and payable under the provisions of law applicable to the city * * * in which the tangible property is located, it shall appear that the * * * corporation affected has paid to such city * * * for its exclusive use within the next preceding year, under any agreement therefor, or under any statute requiring the same, any sum based upon a percentage of gross earnings, or any other income, or any license fee, or any sum of money on account of such special franchise, granted to or possessed by such * * * corporation, which payment was in the nature of a tax, all amounts so paid for the exclusive use of such city * * * except money paid or expended for paving or repairing of pavement of any street, highway or public place, shall be deducted from any tax based on the assessment made by the state board of tax commissioners for city * * * purposes, but not otherwise; and the remainder shall be the tax on such special franchise payable for city * * * purposes."

By these provisions, the Legislature clearly recognizes that such payments are in the nature of taxes. The purpose of the Legislature in allowing such deductions on the payment of the taxes was to prevent inequality in taxation as between street railway corporations, which were required to make such payments, embracing the corporations which have received grants of late years, and those corporations which were not required to make such payments, embracing most of the older corporations. Heerwagen v. Crosstown Ry. Co., 90 App. Div. 275, 86 N. Y. Supp. 218, affirmed 179 N. Y. 99, 71 N. E. 729; Matter of New York C. I. Co. v. Moynahan, 148 App. Div. 908, 134 N. Y. Supp. 17. The rule is well settled that taxes are to be deducted (People ex rel. Jamaica Water Supply Co. v. State Board, supra, on reargument 197 N. Y. 33, 90 N. E. 112; People ex rel. Third Ave. Co. v. St. Bd., 136 App. Div. 155, 120 N. Y. Supp. 528, affirmed 198 N. Y. 608, 92 N. E. 1098; People ex rel. Brooklyn Heights R. R. Co. v. State Bd., 69 Misc. Rep. 646 at 653, 127 N. Y. Supp. 825, affirmed 146 App. Div. 372, 131 N. Y. Supp. 49, 204 N. Y. 648, 97 N. E. 1113), and there is no difference in principle in my opinion between ordinary taxes and those disbursements.

[22] Twelfth. The relators contended on the hearing that there should have been deducted from the gross income an item aggregating $4,675.92 for taxes paid in the year 1909 for the year 1908, and an item of $8,864.81 for assessments for local improvements levied in 1906, 1907, and 1908, but paid in the year 1909; and they make the same claim on the appeal. The net earnings rule as announced by the Court of Appeals contemplates merely the deduction of the operating expenses for the year during which the gross receipts have been received, and neither the payment of taxes for prior years, nor the payment of other obligations, has any bearing on the question as to what is the value of the special franchises to be determined by the application of the net earnings rule.

[23] Thirteenth. The relators paid during the year 1909 an item of $539.30 as "an assessment for some sort of improvements" as shown by the record. If that assessment was on the property on which the relators were entitled to a return, it should have been deducted, but the evidence does not show against what property it was levied, or anything further with respect to it. The appellants, therefore, are

not entitled to a reduction from the gross income on account of that item.

[24] Fourteenth. During the year in question, the companies were operated by a receiver appointed by the federal court. The relators claim that his salary of $24,000 was an operating expense, and should have been deducted from the gross income. The only argument made to sustain the rejection of this item is that this was an extraordinary situation, and that ordinarily there would be no disbursement for the salary of a receiver. The receiver, however, took the place of the president or general manager of the company, and the payment of his salary was a necessary disbursement, and presumably saved the payment of salaries to others for the performance of the duties which he performed.

[25] Fifteenth. The court found that the relators received $5,953.18 for "Interest & Discount" from the use of their property in operating the franchises; and that was included as part of the gross receipts. This was taken from a tabulation made from the books of the relators by an accountant for the respondents; but the particular source of the income is not otherwise shown. It appears that the court allowed the relators a return on a working capital of $400,285.65, and for aught that appears this item may have been for interest earned on this working capital. The appellants contend that this item should not have been included in gross income. I think they have not shown sufficient basis to warrant its deduction, and that it was properly included in the gross receipts.

[26-28] Sixteenth. The appellants also claim that the court erred in deducting $206,735.89 from the operating expenses of the relators for the year 1909 in arriving at the net income. By the stipulation, to which reference has been made, it was stipulated that the operating expenses for the relators for the year 1909 were $1,704,477.87, but that there was included in this amount the sum of $273,857.31, which the Attorney General claimed was for replacements, and was covered by an allowance of $336,695.99, made in the same stipulation for depreciation for that year. Instead of calling experts to show what would be a proper allowance for depreciation, and what should be embraced in such an allowance, the parties stipulated that the relators were entitled to deduct from their gross earnings for the year ending December 31, 1909, said last-named sum "on account of a depreciation allowance." The record contains no evidence, other than the phraseology of this stipulation, as to what items were intended to be included in the stipulated allowance for depreciation. The learned counsel for the city contends that the rule is now established that there can be no allowance for the creation of a sinking fund, and that the only allowance that may lawfully be made on account of depreciation is a straight annual allowance. This contention appears to be sustained by the case of People ex rel. Manhattan Ry. Co. v. Woodbury, supra. That case, however, is not decisive of the question arising on the contention made by the appellants. In People ex rel. Third Ave. R. R. Co. v. State Board, 136 App. Div. 155, 120 N. Y. Supp. 528, affirmed without opinion 198 N. Y. 608, 92 N. E. 1098, Mr. Justice Kellogg, in

writing the opinion for the Appellate Division, said that the fund which a public service corporation is entitled "to set aside each year from its earnings" to provide for the replacement of its property is "outside of the ordinary annual expenses for maintenance, renewal and repairs," and that:

"The annual ordinary expenditures for repairs, replacements, and renewals upon such a property cannot be assumed to make it unnecessary to provide a fund which will replace its engines, electrical equipment, and other physical property which at some time must be replaced."

The court in that case also held that the state board of tax commissioners and the city were at liberty to show that any items for replacements or renewals included in the accounts of the company's operating expenses are such as would be covered by the depreciation fund. In the Jamaica Water Supply Case, supra, the Court of Appeals held that the court might take judicial notice of the fact that there is a constant deterioration of a plant, lessening the value of the tangible property, which is not made good "by ordinary" repairs. And with respect to the amount of such depreciation and the manner in which it should be provided for said:

"The amount of this depreciation differs in different enterprises, but the annual rate is usually capable of estimate and proof by skilled witnesses. No corporation would be regarded as well conducted which did not make some provision for the necessity of ultimately replacing the property thus suffering deterioration; and we cannot see why an allowance for this purpose should not be made out of the gross earnings in order to ascertain the true earning capacity."

In that case the Appellate Division, discussing the same point (128 App. Div. 18, 112 N. Y. Supp. 396), said:

"Perhaps the evidence would justify the conclusion that the amount allowed for maintenance is sufficient to replace from time to time as may be necessary the mains, hydrants, and some of the other tangible property of the company. But it must have expensive pumps and machinery and other property which is liable to serious depreciation by use, and in time to actual destruction, so that prudence would require that each year a certain reasonable sum be laid aside as replacement or up-keep fund for such contingencies as are not covered by the ordinary maintenance charges. If such fund is not maintained, the property is being robbed for the purpose of paying dividends or exaggerating its paper value."

In People ex rel. Manhattan Ry. Co. v. Woodbury, supra, the Court of Appeals, in discharging the sinking fund rule, announced the true rule to be:

"That the annual allowance for depreciation should be computed by dividing the values of the various kinds of tangible property by the number of years of their respective estimated physical lives."

It is, I think, fairly established by the authorities cited that in addition to deducting from gross receipts the ordinary expenses of operation, including ordinary repairs and ordinary renewals and replacements of parts of old appliances, machinery, structures, and equipment by new, as distinguished from expenditures for new construction and new machinery appliances and equipment, a further annual deduction to cover current and future disbursements for new construc-

tion and new machinery, appliances, and equipment is authorized under the rule last promulgated by the Court of Appeals, which, I think, contemplates that in determining the probable life of each item or unit of tangible property suffering depreciation, obsolescence shall be duly considered. The books of the company showed operating expenses in the amount of $1,705,665.37, instead of the amount stipulated, and from this item the court deducted the sum of $206,735.89, on the ground that that amount of the total operating expenses represented sums expended for "renewals and replacements," which the court, according to the opinion delivered, understood was intended to be covered by the stipulated amount claimed by the Attorney General to have been expended for replacements, and that it had not actually been expended during that year. It appears that the company during that year expended $118,557.58 for reconstruction, which was not included in the operating expenses. Witnesses called for the appellants testified that the amount charged on the books for operating expenses, which evidently was the basis for the stipulation, included only ordinary annual expenses for maintenance, repairs, and renewals. The engineer in charge of maintenance of way for the Third Avenue Company testified that in the amounts charged to operating expenses the only items of expenditures that in his opinion constituted renewals as distinguished from repairs amounted to $30,830.96. The superintendent of car equipment of the Third Avenue Company testified that expenditures for replacements embraced only "complete units, such as a car body or electrical equipment and car trucks," and that the only items in the operating account properly chargeable to replacements aggregated $661.67. The chief engineer of the Third Avenue Company testified that replacements applied only to replacements of "a complete principal part," as, for instance, "the replacing of a dynamo complete or a boiler complete;" and that there were no replacements included in the operating expenses. The electrical engineer in charge of ducts and feeders testified that he did not consider the replacement of "cables and ducts" as replacements; but that, "in the place of channel rails, I should consider that renewals made on account of worn out channel rails and so forth should be replacements," and that there were in his opinion expenditures for replacements in his department aggregating $10,497.42, which were charged to operating expenses. The total of these amounts which the appellants concede were expenditures for renewals and replacements, but were charged to the operating account aggregated $41,990.05. The only evidence offered on this point by the city was a report made by a committee of engineers appointed by the respective parties to proceedings to review the assessment of the Metropolitan System, including the Third Avenue Company, for the year 1905, to determine what constituted renewals and replacements as distinguished from repairs. It shows that the committee for the purposes of that proceeding agreed upon certain items as chargeable to renewal account. One of the members of the committee called as a witness for the respondents testified, in effect, that the items therein specified as chargeable to renewals were properly so chargeable, and that, at the request of counsel for the city, he

made out a list of items which he deemed to be renewals. From that list an accountant made a tabulation from the books of the appellants by comparison, and testified, in effect, that he found by such comparison that items aggregating $206,735.89 were charged to operating expenses, which were for renewals and replacements. The evidence given in behalf of the respondents for the purpose of showing that there were included in the operating expenses items for which the allowance for depreciation was made has but little probative force. Particular items were not selected and specified upon which the court could predicate its judgment. The mere tabulation of items by an accountant and comparison by corresponding names, as stated, was not sufficient to outweigh the testimony presented in behalf of the appellants, particularly that to the effect that no items other than those for ordinary repairs and renewals were charged to operating account. We are of opinion that the court erred in reducing the operating expenses by the amount specified, and that that item should be reduced only by said amount of $41,990.05, which in the circumstances may, we think, be assumed to represent expenditures for new equipment, machinery, appliances, and construction, as distinguished from renewals of parts of such tangible property. On this theory the net income should be reduced by $164,745.84.

It follows from the views I have expressed that the final net income was $224,841.88. This apportioned between the two companies, upon the same basis as that followed by the Court at Special Term, shows the net income of the Third Avenue Company to be $210,101.-25, and that of the Kingsbridge Company to be $14,740.63. These amounts capitalized at 7 per cent. show the value of the special franchises of the Third Avenue Company to be $3,001,446.43, and of the Kingsbridge Company to be $210,580.42. Adding to the value of the special franchises of the Third Avenue Company the value of the tangible property in the streets, which was found to be $3,102,659.40, as stated, and which is assessed as part of the special franchises, shows a total value for that company of $6,104,105.83; and adding to the value of the special franchises of the Kingsbridge Company the value of its tangible property in the streets, found to be $488,643, shows a total value for that company of $699,223.42. These values are less than the assessments. The assessments as thus reduced must be further reduced by 10 per cent. in order to equalize them with other assessments on the same roll. It is thus found that the assessment against the Third Avenue Company should have been $5,493,695.25, and that against the Kingsbridge Company should have been $629,-301.07.

The relators concede that they claimed before the state board of tax commissioners that the assessment of the Third Avenue Company was excessive by $7,000,000. Inasmuch as that assessment was not found to be excessive by the court at Special Term, and is not found by this court to be excessive by one-half of that amount, they are not entitled, under section 294 of the Tax Law, to costs.

It follows, on the computations made by the relators, which if erroneous may be corrected on settlement of the orders, that the orders

should be reversed, and the assessment against the Third Avenue Company should be reduced to $5,493,695.25, and that against the Kingsbridge Company should be reduced to $629,301.07, and, as thus reduced, affirmed without costs. All concur.

---

PEOPLE ex rel. FORTY–SECOND ST. M. & ST. N. AVE. RY. CO. v. STATE BOARD OF TAX COM'RS et al.

(Supreme Court, Appellate Division, First Department. July 10, 1913.)

1. TAXATION (§ 496*)—SPECIAL FRANCHISE TAX—REVIEW—PRESUMPTION.
   Where a street railway company on certiorari to review the assessment of its special franchise failed to show what use it made of a loft building owned by it, it cannot be presumed that it was used in connection with the franchise, but, if it was so used, such fact should have been shown.
   [Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 890–910; Dec. Dig. § 496.*]

2. TAXATION (§ 376*)—SPECIAL FRANCHISE TAX—RETURN OF TANGIBLE PROPERTY—USE IN CONNECTION WITH FRANCHISE.
   A street railway company owning a building, and using it in connection with its special franchise, is to be allowed a return thereon, but one which it rented and did not use was to be excluded from consideration.
   [Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

Appeal from Special Term, New York County.