(159 App. Div. 136.)

PEOPLE ex rel. METROPOLITAN ST. RY. CO. v. STATE BOARD OF TAX COM'RS (CITY OF NEW YORK, Intervener).

(Supreme Court, Appellate Division, First Department. November 14, 1913.)

1. TAXATION (§ 493*)—ASSESSMENTS—REVIEW OF ASSESSMENTS.

Where the relators were guilty of no unreasonable delay in making reports on which to base their franchise assessments and the reports were as full and detailed as it was possible to make, the relators cannot be deprived of their right to review the assessment under Tax Law (Laws 1899, c. 712) § 44.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 876–883; Dec. Dig. § 493.*]

2. EVIDENCE (§ 522*)—EXPERT OPINIONS—VALUE—FRANCHISE TAXES.

In valuing special franchises, expert testimony as to the value of the franchise is not admissible where the business had been in operation for a long time and the value of the franchise could be ascertained under the net earnings rule.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2330; Dec. Dig. § 522.*]

3. TAXATION (§ 376*)—ASSESSMENT—FRANCHISE TAXES.

In assessing a street railway company's special franchise for taxation, earnings and expenses incurred by the street railway in operating cars over another company's line should be disregarded.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

4. TAXATION (§ 493*) — OBJECTIONS TO ASSESSMENT — REVIEW — CHANGE OF THEORY.

Where a street railway company upon a proceeding to assess its franchise for taxation introduced evidence showing its property's depreciation, although the rule of a decision which then prevailed allowed credit for depreciation only on the sinking fund theory, the street railway company, on certiorari to review the assessment, may, the rule of decision having been reversed, claim credit for the actual amount of depreciation; this not being a change in its theory of action.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 876–883; Dec. Dig. § 493.*]

5. TAXATION (§ 376*)—ASSESSMENT—FRANCHISES.

In assessing a street railway company's franchise, payments made to the city as rent for the use of streets and in accordance with the terms of the company's charter should be deducted.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

6. TAXATION (§ 376*)—ASSESSMENT—FRANCHISE TAXES.

In assessing a street railway company's franchise, it should be allowed credit for a building which was used for street railway purposes only a part of the year, although it had not been able to rent the building during the remainder of the year; such a company having a reasonable time in which to dispose of or change the use of its property.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

7. TAXATION (§ 376*)—ASSESSMENTS—FRANCHISE TAXES—WORKING CAPITAL.

In assessing a street railway company's franchise, the value of materials and supplies on hand which were necessary for the operation of

the road may be included in the working capital on which the company is allowed a deduction.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

8. TAXATION (§ 376*)—ASSESSMENTS—FRANCHISE TAXES—PAVING.

In assessing a street railway company's franchise, the value of paving laid by it between the tracks should be considered, even though the company does not own the pavement, as it was compelled to lay it in constructing the line.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

9. TAXATION (§ 376*)—ASSESSMENTS—FRANCHISES—STREET RAILWAYS.

In assessing a tax on the street railway company's franchise, the cost of removing pipes and other obstructions which were removed when the company installed underground electric power should be considered.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

10. TAXATION (§ 376*)—ASSESSMENTS—FRANCHISE.

In assessing for taxation a street railway company's franchise, calendar year adjustments, consisting of small charges against operating expenses which were delayed in getting upon the books and therefore were not included in the statement for the proper period to which they actually relate, are properly deducted.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

11. TAXATION (§ 493*)—ASSESSMENT—FRANCHISE—INCREASE.

Upon certiorari to review an assessment for taxation on a railroad company's franchise, the assessment actually made cannot be increased.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 876–883; Dec. Dig. § 493.*]

12. TAXATION (§ 376*)—ASSESSMENTS—FRANCHISE TAXES.

Where a number of street railway lines were operated together and the total equalized value of the tangible and intangible value of the whole system was larger than the total of the amount apportioned among the various lines, because portions of the equalized total of the whole system were in excess of the assessment actually made, the taxing authorities cannot complain of the method of apportionment, for they cannot increase the individual assessments, nor can they object to the operation of the system as a whole.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

13. TAXATION (§ 376*)—ASSESSMENTS—FRANCHISES—DEVELOPMENT EXPENSES.

In assessing a franchise, development and organization expenses consisting of promoter's profits, payment for legal services, and other services necessary to render the franchise of value, must be excluded.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

14. TAXATION (§ 376*)—ASSESSMENTS—FRANCHISE—LAND VALUES.

In assessing a street railway company's franchise for taxation, the company is not entitled to credit on a building which it was not using for railway purposes, where it had remained idle for more than 18 months, without any attempt on the part of the company to rent it for other purposes; there being no reason shown to excuse the company for its delay.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**15. TAXATION (§ 376*) — ASSESSMENT — FRANCHISE — INITIAL FRANCHISE TAX PAYMENT.**

Initial franchise tax payments on account of intangible franchises are presumably included in the value of the franchise, and no allowance should be made therefor to the owners of the franchise.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

Appeal from Special Term, New York County.

Certiorari by the People of the State of New York, on the relation of the Metropolitan Street Railway Company, against the State Board of Tax Commissioners to reduce an assessment in which the City of New York intervened. Also separate proceedings by the People, on the relation of New York & Harlem Railway Company, Christopher & Tenth Street Railway Company, Broadway & Seventh Avenue Railroad Company, Thirty-Fourth Street & Crosstown Railroad Company, Forty-Second Street & Grand Street Ferry Railroad Company, Twenty-Third Street Railroad Company, Bleecker Street & Fulton Ferry Railroad Company, Sixth Avenue Railroad Company, Ninth Avenue Railroad Company, Central Crosstown Railroad Company, Eighth Avenue Railroad Company, Fort George & Eleventh Avenue Railroad Company, Joline & Robinson as receivers, and Fort George & Eleventh Avenue Railroad Company, against the same defendant. From an order of the Special Term reducing assessments, the relators, the defendant, and the intervener appeal. Modified and affirmed.

Argued before INGRAHAM, P. J., and LAUGHLIN, SCOTT, DOWLING, and HOTCHKISS, JJ.

Arthur H. Masten, of New York City, for relator Metropolitan St. Ry. Co.

Robert P. Beyer, of New York City, for respondents.

Curtis A. Peters, of New York City, for intervener City of New York.

HOTCHKISS, J. There are in all 26 proceedings, 13 of which relate to special franchise tax assessments for the year 1910, and 13 of 1911. The 13 relators are comprised within the former Metropolitan Railroad system, which was operated by the receivers as a whole; no separate account being kept of the earnings of each franchise or of the lines of the several companies. The franchises of the several relators were assessed against each relator severally, and not as an entity against the Metropolitan Street Railway Company, the parent and operating company. In 11 of the proceedings for each year, there are cross-appeals from orders reducing the assessments for such year. In two of such proceedings, those involving the franchises of the Ft. George & Eleventh Avenue Railroad, and the Ninth Avenue Railroad, the assessments were confirmed. In these cases, the relators only appeal.

I shall take up separately the questions arising upon the several appeals covering the taxes for the respective years in their chronological order.

1910.

(1) Motion to Dismiss.

[1] The State Board and the city contend that the relators' reports to the board were dilatory and insufficient; that the relators thereby incurred the penalty prescribed by section 44 of the Tax Law (Laws 1899, c. 712) of being deprived of their right to review the assessments in question, and for that reason the motion of the learned Attorney General to dismiss the proceedings should have been granted.

A discussion of the evidence would serve no useful purpose, because every case must turn upon its own peculiar facts, and would rarely furnish a precedent. Suffice it to say that I am satisfied the relators were guilty of no unreasonable delay in furnishing reports, and that, having regard for all the circumstances, such reports were as full and detailed as it was possible for the relators to make. The motion to dismiss was properly denied.

(2) Net Earnings Rule.

[2] In valuing the special franchises in question, the court below adopted the net earning rule. In applying that rule the court first treated the Metropolitan system as a whole and ascertained its value, including the tangible property in the streets and the intangible right to operate, and then divided the aggregate amount among the various companies in proportion to the tangible property in the streets owned by each. In the case of People ex rel. Third Avenue R. Co. v. Tax Com'rs, 157 App. Div. 731, 142 N. Y. Supp. 986, this court, per Laughlin, J., said:

"Where, as here, the railroads had been constructed and equipped and completed and in operation, and the relators have been in the full use and enjoyment of all of their franchises for a considerable period of time, I am of opinion that the net earnings rule is presumptively the proper rule by which to determine the value of their special franchises for the purpose of taxation."

Although the facts with regard to the use and enjoyment of the franchises of the relators bring them directly within the words above quoted, the State Board and the city claim that the rule should not be applied, and they rely upon the evidence of one Ford, who, having been produced as an expert witness on the part of the relators to testify to certain values, was asked, upon his cross-examination by the learned corporation counsel, whether he would advise "a combination of capital to expend $20,000,000 to obtain or purchase the franchises in question in these proceedings," to which he made answer, "I would." This figure was considerably above the aggregate sum at which all of the franchises were assessed. The probative value of this testimony is nil. The testimony of experts as to the value of special franchises doubtless always has been, and always will be, obtainable. If the mere production of such testimony is to do away with the application of the net earnings rule, it is strange that so much thought and labor should have been spent in establishing that rule. It would have been so much easier to have relied upon the testimony of experts, in every case, than to have given consideration to the various circumstances and elements on which the rule was founded. It is the general rule that opinion evidence as to value is receivable only under conditions of necessity, where

better evidence is not obtainable. Mayor, etc., v. Pentz, 24 Wend. 668, 673, 674. Such was not this case. The roads in question had long been operated under normal conditions, such as were calculated to show their earning capacity. In ascertaining the value of the intangible right of the system as a whole and then apportioning this aggregate among the constituent companies in proportion to the value of the tangible property in the streets owned by each, the court adopted the only course possible under the circumstances. The rule in the Third Avenue Case should control and the rulings of the court below be affirmed.

(3) Central Park, North & East River Railroad Company Cars.

The question raised is covered by our decision in the Third Avenue Case (157 App. Div. 745, 142 N. Y. Supp. 1000, paragraph 7), and the ruling below was right.

(4) Williamsburgh Bridge Local Cars.

[3] The privilege to operate local cars on this bridge was granted by the city to the Bridge Operating Company which was assessed for this special franchise for 1910. By agreement between the Operating Company, the New York City (assignor of the Metropolitan), and the Brooklyn Heights Railroad Companies, the two latter agreed to operate the cars and to divide profits and losses, guaranteeing an annual dividend of 6 per cent. to the Operating Company. In practice the cars were operated by the Brooklyn Heights Company, which accounts for operations to the receivers of the Metropolitan who included one-half of the receipts and expenses of operating in their account. The cars belonged to the Operating Company and the city owned the tracks. The Metropolitan had no ownership of the franchises of the road which were separately assessed against the actual owner. The court below, instead of excluding both expenses and income arising from the operation of this franchise in question, as should have been done (following our decision in the Union Railway Company Case, 157 App. Div. 763, 765, 142 N. Y. Supp. 986), included operating expenses and excluded earnings. I see no reason for such an apparent inconsistency. Both expenses and earnings should have been excluded.

(5) Depreciation in Excess of Renewals.

[4] The relator was allowed credit for the amounts actually expended for ordinary repairs and renewals, but was not allowed any additional sum for depreciation under the "straight line" theory, although the evidence showed that this amounted to $207,194. The city concedes that the relator's claim is sound in theory, but it contends that the relator tried the case on the "sinking fund theory," the case of the Manhattan Railway Co., 143 App. Div. 905, 127 N. Y. Supp. 1138, standing at that time unreversed, and that the relator cannot now change its position, and they cite the decision of this court in the case of Third Avenue R. Co. v. State Board, 136 App. Div. 155, 120 N. Y. Supp. 528, where the general rule of change of front was applied. I do not think the facts of this case justify the application of that rule. When the case was tried, the trial court was bound by the decision in the Manhattan Railway Case as it then stood, and the

relator could not properly have asked, much less have expected, the court to adopt a different rule. While bowing to the law as it then stood, the relator introduced all the evidence necessary to entitle it to the benefit of the law as it has since been declared (People ex rel. Manhattan Railway Co. v. Woodbury, 203 N. Y. 231, 96 N. E. 420; Third Avenue Case, 157 App. Div. 754, 142 N. Y. Supp. 1006, paragraph 16), and the record presented to us is, in my judgment, sufficient to entitle the relator to the benefit of the facts appearing upon the trial. The order should be modified accordingly.

(6) Percentage of Gross Earnings, etc., Paid to City Under Terms of Franchises.

[5] The court below denied to the relator the right to deduct from income, sundry payments made to the city under a number of franchises in question. Those consisted of percentages of gross earnings paid according to the terms of the franchises, rents paid for the use of certain streets according to franchise provisions, fees for car licenses paid in accordance with the terms of franchises or special ordinances, and tolls paid for the use of the Williamsburgh Bridge. All of those items were in the nature of taxes, and should have been allowed. See Third Avenue Case, 157 App. Div. 751, 142 N. Y. Supp. 1004, paragraph 11.

(7) Valuation of Land and Buildings.

[6] The questions raised affect a number of parcels. The action of the court below with respect to all of these items, save one, should be approved. In the case of the premises 13–17 Front street, I think the court below was in error. The evidence showed the value of the property to have been $179,404. The defendant conceded a value $59,800.62, being one-third of the actual value. The court allowed $107,037. How the court reached its figures does not appear. The contention of the defendant was that the property had only been used one-third of the year for railroad purposes, and hence but one-third of its value should be allowed. The facts are that until May, 1909, the building was used as a substation. It was then abandoned as a substation, but two floors of the premises continued to be used as a storehouse for material. Attempts to rent the premises were unsuccessful. It thus appears that on the second Monday of January, 1910, a substantial portion of the premises were used for railroad purposes, and that no part of it had been used for any other purpose. In the Third Avenue Case, supra, 157 App. Div. page 749, 142 N. Y. Supp. 1003, we held that the corporation was entitled to the benefit of the full value of a building purchased for railroad purposes, although too large for its immediate use and only part of which was then actually necessary for railroad purposes. This was put upon the ground that:

"The company was not required, in building, to limit the size of its building to its requirements at the time, but had authority * * * to build for the reasonable future requirements."

The converse of this proposition should be equally true, where the company has acquired property which it has used for railroad purposes, but which in whole or in part has become obsolete or has for

other reasons been wholly or partly abandoned, a reasonable time should be afforded the company to sell or make some other disposition of it. This view is fortified in a case where the company has continued to use a portion of such property for railroad purposes for a not unreasonable period after the complete use has become no longer feasible. Under such circumstances it should be allowed the benefit of the full value of the property for such a reasonable period as would permit it to find some use for the property from which revenue could be derived. The facts with respect to the property in question are such as to fairly entitle the relator to an allowance for the full value of the property for the purposes of the tax of the year in question.

(8) Cash, Prepaid Insurance and Accounts Receivable.  .
[7] The court allowed relator to include the above items, and also the value of materials and supplies on hand, under the head of "working capital," upon which the benefit of a return was allowed. The testimony justified the finding that the total amount so allowed was not only reasonable, but a minimum sum for that purpose, and the ruling of the court below was right upon the authority of the Manhattan Case, 203 N. Y. 231, 96 N. E. 420. I see no force in defendants' argument that the items in question are per se not to be considered as working capital. They are not to be differentiated from materials and supplies on hand, which counsel concede are proper elements.

(9 and 10) Return on Organization, etc., Expenses, and Capitalizing
      Net Income at 6 per cent. instead of 7 per cent.
The parties conceded that, with respect to the first item, the decision below was right, and should be affirmed, and with respect to the second item, the defendants concede that the court below erred, and that the order should be modified accordingly. See Third Avenue Case, supra, 157 App. Div. 745, 747, 142 N. Y. Supp. 986.

(11) Value of Paving.
[8] In fixing the value of the relator's structure in the streets, the court below included a certain sum as for value of the paving within the railroad area. The tracks are laid on the surface of the streets, and the pavement is part of the roadway. Concededly, the relators paid for the new pavement incident to the restoration of the old pavement which was destroyed upon the construction of the road, and that it is the relator's duty under section 178 of the Railroad Law (Consol. Laws 1910, c. 49) to maintain the pavement in repair. For these reasons, relator claims to be entitled to a return upon the depreciated amount of the investment thus represented. That the cost of taking up and relaying the pavement is part of the initial cost of building a street railroad within a city, and that such cost is an element in arriving at the value of the tangble property upon which the company is entitled to a return, seems clear. It would seem equally clear that the cost of renewing and keeping such pavement in repair is a proper item of cost of maintenance of right of way, and, as such, chargeable to operating expenses. The relators apparently admit these propositions; but, if I understand their argument, it amounts to this: In estimating

the value of our tangible property in the streets, the cost of the pavement is an element to be considered, but as we do not own the pavement, in estimating the value of our special franchises, there should be an appropriate deduction from what would otherwise appear to be the net value of such franchise, as the obligation "to maintain" the pavement has been held to be a tax (City of Rochester v. Rochester Railway Co., 182 N. Y. 99, 74 N. E. 953, 70 L. R. A. 773), and, "if the relators were compelled to pay a tax upon the value of the pavement, they would be compelled to pay a tax upon a tax." The mere statement of the proposition would seem to furnish its own answer. The question of maintenance is not in the case. The relators are not taxed upon the pavement any more than upon any other separate item of construction cost. Moreover, while the relators do not own the pavement, they do in a sense own the value of the labor and material incident thereto, because such value is included in the cost of their tangible property in the streets upon which they are allowed a return.

(12) Cost of Removal of Obstructions.

[9] The principle upon which relators seek allowance for this item is the same as that involved in case of the pavement. Relators showed that approximately $1,175,000 represented the depreciated cost of removing pipes, cables, and all other underground structures from beneath the area occupied by the tracks, which cost had been incurred when underground electric power was installed upon the several roads, and which expense necessarily would not have to be incurred again were the roads to be reconstructed; hence, as this cost does "not seem to be represented at the present time in the value of the track and roadway," they should not be taxed upon it.

The fallacy of this argument lies in the fact that the reproduction theory which is made a test of value is a theoretical rather than an actual reproduction in the light of present existing physical conditions. We must start with the premise that no railroad exists and no work necessary to the completion of the structure has been done; hence the cost of removing obstructions which did exist is a proper element in estimating value on the basis of cost of reproduction. If we were to begin an appraisement of value with the assumption that one proper element of original cost has been eliminated, we might as well assume the existence of every item necessary to the completed road, and thus we would be brought to the absurd result of finding no value whatever.

(13) Calendar Year Adjustments.

[10] This question relates to certain charges against operating expenses, which it is claimed were erroneously allowed. The items in question were such as became known after the books for the period in question had been closed, and it is fairly to be inferred that they represent a class of small items which it is common in conducting large businesses to find, for one reason or another, have been delayed in getting upon the books, and therefore have not been included in the statements for the particular period to which they actually relate. But year in and year out, these items correct themselves, so that, if we were to be technical and should strike out the items for the period ending the second Tuesday in January, 1910, in order to do exact justice, we

should be compelled to strike out the items relating to the previous year which have been included in the period now under review. The ruling below should not be disturbed.

(14) Discrepancy Between Total Ascertained Assessments and Amount Found by the Court.

[11, 12] The court below found that the equalized total value of the tangible and intangible property of the whole system was $31,199,-724, which amount is apportioned among the several companies in proportion to the value of their respective tangible properties. So apportioned, the total amounts to $65,370, less than the aggregate equalized total of the whole system. This difference arises from the fact that the portions of the equalized total of the whole system assigned to the Ninth Avenue and the Fort George roads were in excess of the actual assessments made by the defendants against these companies, which assessments, of course, could not be increased. The defendants complain of the method of apportionment adopted by the court below, but they suggest no way out of the difficulty. I see none. The complication arises from the necessities of the situation; the roads having been operated as a system, and no accounts of the earnings of the several roads having been kept. As such operation was not illegal, and inasmuch as any method of arriving at intangible values at best produces an approximate result only, such a discrepancy as that in question must be accepted as an incident of the situation.

## 1911.

The cases upon which these appeals arise were tried before a court presided over by a different justice than the one before whom the 1910 cases were tried. They raise some questions which are identical with those raised in the 1910 cases, some which are somewhat different, and some which are not involved in the other case. Those questions which are common to both cases, and in which the court in the 1911 case followed the rulings of the court in the 1910 case, are (following the numerical designation hereinbefore adopted) as follows: Nos. 2, 6, 8, 9, 10, 11, and 12. Our decision in these matters should follow our decision in the 1910 case. The points on which the court below in the present case decided differently from the decision of the trial court in the 1910 cases are:

Williamsburgh Bridge.

The court below excluded both revenue and expenses, which was right.

Rents Received from Central Park, etc., Railroad Company.

The order should be modified to conform to the opinion in the 1910 cases.

Organization and Development Expenses.

[13] The court below allowed $2,098,069. In the Third Avenue Case, supra, 157 App. Div. page 749, 142 N. Y. Supp. 986 (paragraph 9), we held that so much of the so-called "development expenses" as included organization expenses, legal services, technical advice, promoters' profits, and all other items which "did not add to the value

of tangible property," are to be excluded, but taxes and interest during construction, and other similar items which add to such value, should be allowed for.  As was said in the Third Avenue Case, 157 App. Div. 749, 142 N. Y. Supp. 1002:

"For the so-called development expenses no tangible property is acquired. Those expenses are incurred in developing the franchises to render them of value.  In so far as anything is obtained for such items of disbursements, it is represented by the intangible element of the special franchises, and if so, it is manifest that it could not properly be considered."

The above amount of $2,098,069 the court below found (finding 114, fol. 525) was made up of items covering "corporate organization, obtaining franchises and consents, certificates," etc., incident thereto, engineering expenses, expenses of issuing and marketing of securities, and "other intangible elements of expense."  All the above items should be excluded, and the order should be modified accordingly.

In addition to the above, the relators bring up for review the question of certain land values, and on the defendants' appeal there is raised the question of allowances on account of payments made for special franchise tax of 1910, and an item of initial franchise payment.

Land Values.

[14] The properties in question are the same as those involved in the 1910 case, and with respect to all, our decision should follow the determination in that case, except so far as the premises 13–17 Front street are concerned.  As we have seen, the premises were abandoned as a substation in May, 1900, but continued to be used in part for railroad purposes, and were so used on the second Tuesday of January, 1910.  In the 1910 cases, we allowed the full value of the premises to be deducted.  It was not offered for rent until January, 1911, but inasmuch as a year and 16 months had elapsed, which, in the absence of evidence to the contrary, would seem to be a reasonable time for the relator to find some use for the unused part of the property, or in default thereof be compelled to assume the burden thereof, the ruling of the court below in charging the relators with the reasonable value of such unused portion should be affirmed.

Allowance of $300,000 for 1910 Franchise Tax Payment.

The court below allowed the sum of $300,000, as being the sum due and assumed to be paid on account of the relators' 1910 tax.  If the result of our decision in the 1910 cases is to disturb this amount, there should in justice be some way of correcting any error represented by the allowance of the $300,000 herein.  The relators concede this, and in their brief counsel say they will consent "to any proper arrangement."  The amount should be held open until the order in the present case is settled, and then the proper amount can be adjusted and incorporated into the accounts.

Initial Franchise Payment.

[15] Included in the valuation of property outside the streets, on which a return was allowed to the relators, was the sum of $151,000 "initial franchise tax payments."  Such payments are made on account of the intangible franchise, and are presumably included in the value

thereof. Under our ruling in the Third Avenue Case, supra, their allowance was erroneous, and the order should be modified accordingly.

The rulings of the court below as evidenced by the several orders appealed from should be modified with appropriate findings, or affirmed in accordance with this opinion, and the question of costs will be held until the entry of the final order. If the parties cannot agree upon the figures, they may submit their differences upon settlement of such order. All concur.